IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SAMUEL M. JACOBS, | ) | |
| | ) | CASE NO. 5:15-cv-00376 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Samuel M. Jacobs ("Jacobs") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title(s) II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

## I.  Procedural History

On February 24, 2012, Jacobs filed applications for POD, DIB, and SSI alleging a disability onset date of October 15, 2011.  (Tr. 20.)  His application was denied both initially and upon reconsideration.  *Id*.

On May 30, 2014, an Administrative Law Judge ("ALJ") held a hearing during which Jacobs, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 20.)  On July 16, 2014, the ALJ found Jacobs was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 30.)  The ALJ's decision became final when the Appeals Council denied further review.

## II.  Evidence

### *Personal and Vocational Evidence*

Age thirty-eight (38) at the time of his administrative hearing, Jacobs is a "younger" person under social security regulations.  *See* 20 C.F.R. §§  404.1563(c) & 416.963(c).  Jacobs has at least a high school education and past relevant work as an assistant manager, tow motor operator, and cook.  (Tr. 29.)

### *Relevant Medical Evidence*[1]

Prior to his October 15, 2011 alleged onset date, Jacobs underwent an MRI of the lumbar spine on January 8, 2011 revealing mild to moderate disk degeneration and small disk extrusion with S1 nerve root compression.  (Tr. 460-61.)

---

[1] Large portions of the transcript bear no page numbering.  As such, the Court will utilize the page numbers the Clerk's Office superimposes on top of each page (*i.e.* __ of 581.)  For the sake of consistency, even where there is page numbering of the transcript, the Court will continue to use the superimposed numbering.  The lone exception is the ALJ's decision, where the Court uses the bold numbering in the bottom right corner of the page.

On January 30, 2011, a CT scan of the spine showed degenerative retrolisthesis at C6-C7, diffuse idiopathic skeletal hyperostosis, and mild congenital narrowing of the central canal.  (Tr. 379.)

On April 6, 2011, Jacobs began treatment with John Walker, M.D.  (Tr. 451-55.)  His gait and spine range of motion were normal.  (Tr. 454.)  He was unable to walk on his toes or heels, and had positive straight leg raise and left leg muscle atrophy.  *Id*.  He was prescribed Percocet and Flexeril.  *Id*.

At a follow-up on May 6, 2011, Dr. Walker noted joint pain, limitation of joint movement, and muscle pain, as well as neurologic weakness, numbness, and paresthesia.  (Tr. 447.)  Dr. Walker observed Jacobs's gait was abnormal, as he walked with a limp.  (Tr. 448.)  He also observed muscle weakness and decreased muscle tone in the lower extremity.  *Id*.  Dr. Walker assessed disc degeneration, chronic, not controlled; pain, chronic; and, sciatica, chronic, not controlled.  (Tr. 448.)  Jacobs was switched from Percocet to Oxicodone and his prescription for Neurontin was increased.  *Id*.  Diet, exercise, and regular physical activity were recommended.  (Tr. 449.)  In a letter the same date, Dr. Walker indicated that Jacobs "would benefit from lifting no more than 15 pounds as well as being able to sit down every 45 minutes to ease the stress on his back and legs."  (Tr. 445.)

On June 6, 2011, Dr. Walker again noted limitation of joint movement, muscle pain, and neurologic weakness, numbness, and paresthesia.  (Tr. 441.)  Dr. Walker observed Jacobs's gait was abnormal (walks with a limp), hip joint tenderness and muscle weakness in the left extremity, 4/5 muscle strength, and abnormal knee reflex.  (Tr. 442.)  He prescribed Gabapentin, Lyrica, and Oxycodone.  (Tr. 442.)  Dr. Walker continued to recommend diet, exercise, regular

3

physical activity, and balance and resistance training.[2]  *Id*.

On July 5, 2011, Dr. Walker noted Jacobs had no joint swelling, no joint or muscle pain, and no neurologic weakness.  (Tr. 437.)  Jacobs did have limitation of joint movement, as well as neurologic numbness and paresthesia.  *Id*.  Dr. Walker observed abnormal gait, and in the left lower extremity, muscle weakness and decreased muscle tone.  (Tr. 438.)  Jacobs also had an abnormal light touch sensation.  *Id*.  Dr. Walker prescribed Amitriptyline and Oxycodone.  *Id*.

On August 4, 2011, Jacobs complained to Dr. Walker that his left leg is still the same, but the medications really help him stand longer.  (Tr. 430.)  He tries not to use his cane too much.  *Id*.  Jacobs's muscle and joint pain and neurologic weakness returned.  (Tr. 431.)  Other musculoskeletal and neurologic symptoms and examination results remained largely unchanged.  (Tr. 431-32.)  Dr. Walker assessed sciatica, insomnia, and tobacco abuse.  (Tr. 432.)  Ambien was added to Jacobs's prescriptions.  (Tr. 433.)

On August 19, 2011, Jacobs reported to the Wooster Community Hospital ER complaining of increased lower back pain radiating down his left leg.  (Tr. 357.)  Jacobs had 5/5 grip strength, no signs of cauda equina, and normal knee jerk reflexes.  *Id*.  He did have pain on palpation over his lumbar spine and left SI joint.  *Id*.  He had a positive straight leg raise on the left.  *Id*.

On September 2, 2011, Jacobs told Dr. Walker that his midday pain was a 6 of 10 as compared to 4 of 10 with Oxycodone.  (Tr. 425.)  Jacobs also stated he was using a cane on a regular basis.  *Id*.  Jacobs's musculoskeletal and neurologic symptoms, examination results, and

---

[2]  Treatment notes also included the following: "Additional testing details: order for Cane." (Tr. 444.)  Jacobs' brief asserts that this amounted to a prescription for a cane, though this is disputable.  (ECF No. 15-1 at 4.)

prescriptions remained largely unchanged.  (Tr. 426-28.)

On September 5, 2011, Jacobs again went to the Wooster Community Hospital ER with complaints of left sided back pain radiating down to his leg.  (Tr. 348.)  Examination revealed some left-sided muscular tenderness and negative straight leg raise but with pain on the left at about 40 degrees.  He was instructed to follow up with his doctor.  *Id.*

Shortly before his October 15, 2011 alleged onset date, Jacobs was seen by Dr. Walker on October 4, 2011.  (Tr. 420-24.)  Jacobs stated that he was able to complete his job with appropriate rest periods and his pain, though present, was "manageable."  (Tr. 420.)  Jacobs stated that he was concerned about anxiety, and had increased agitation and irritation.  *Id*.  Dr. Walker noted that Jacobs had an abnormal gait (walked with a cane), no muscle weakness but decreased muscle tone since previous visits, and no neurologic symptoms. (Tr. 423.)  Anxiety was added to Dr. Walker's assessment and he prescribed Ativan and Paxil.  (Tr. 423.)

On November 1, 2011, Jacobs reported to Dr. Walker that he was compliant with medication and noticed improvement doing his exercises.  (Tr. 416.)  Jacobs stated that he is able to work and perform his activities of daily living.  *Id*.  Jacobs also opined that the prescriptions for Ativan and Paxil worked well for his anxiety.  *Id*.  Dr. Walker noted that Jacobs had an abnormal gait, no muscle weakness but decreased muscle tone, back stiffness and pain, joint pain (without swelling), muscle pain, limitation of joint movement, neurologic weakness but no numbness or paresthesis, difficulty sleeping, and anxiety.  (Tr. 416-418.)  Jacobs's prescriptions remained unchanged.  (Tr. 419.)  Dr. Walker recommended that he quit smoking and exercise regularly, to include flexibility exercises and resistance training.  *Id*.

On November 14, 2011, Jacobs presented to the Wadsworth-Rittman Hospital ER stating

5

that he exacerbated his back while performing yard work.  (Tr. 328.)  Examination revealed

soreness of the left paraspinal lumbosacral musculature and left sided sciatica.  (Tr. 329.)  No

problems were detected in the extremities.  *Id*.  He was instructed to follow up with his primary

care physician.  *Id*.

On November 22, 2011, Jacobs complained to Dr. Walker that he had pain in both

shoulders and that his hands go numb.  (Tr. 410.)  Dr. Walker noted neck pain/tenderness without

stiffness but with abnormal range of motion; limitation of joint movement but no joint pain;

neurologic weakness, numbness, and paresthesia; shoulder joint tenderness with abnormal range

of motion; tight shoulder pain; right hand cold to the touch; positive Spurling's sign; and,

difficulty sleeping.  (Tr. 411-12.)  Dr. Walker recommended regular physical activity, flexibility

exercises, and resistance training.  (Tr. 412.)

On December 12, 2011, x-rays of Joacobs's cervical spine revealed degenerative changes

an a "rather large osteophyte arising from the anterior    inferior aspect of the C4 vertebral body."

(Tr. 374.)

On February 7, 2012, Jacobs again went to the Wooster Community Hospital ER

complaining of pain radiating down his right arm.  (Tr. 336.)  Examination was largely

unremarkable except for some tenderness to palpation over the right trapezius at the base of the

neck.  *Id*.  Clinical notes indicated that the attending physician asked Jacobs when he was last

prescribed narcotics, to which Jacobs responded "several months" ago.  *Id*.  The attending

physician discovered Jacobs had filled a prescription for narcotics just ten days earlier and that a

30-day supply of Oxycodone (90 tablets) was gone in 10 days.  (Tr. 336-37.)  The doctor wrote,

"I do not feel he is being honest with me. I certainly will not write him a script for any narcotic

6

pain meds, certainly do not think he needs any radiographic studies as he has . . . nontraumatic neck pain."  (Tr. 337.)

On February 20, 2012, an MRI revealed right paramedian posterior/caudal disk protrusion, with mild mass effect on the ventral spinal cord, as well as multilevel degenerative changes with foraminal stenosis.  (Tr. 370.)

On February 21, 2012, Jacobs told Dr. Walker he was having "much more problems" with his back and shoulders, had a pain level of 7 out of 10, and severe twitching in the back or legs.  (Tr. 400.)  Dr. Walker noted chest pain, palpitations; abnormal memory function; pain in left leg with all range of motion but otherwise no abnormalities in the lower extremities regarding range of motion, muscle weakness, or muscle tone; and, abnormal light touch sensation.  (Tr. 400-402.)  Dr. Walker assessed chronic pain, periodic limb movement disorder, and sciatica.  (Tr. 403.)  Ropinirole was added to his prescriptions.  *Id*.

On March 21, 2012, Jacobs reported his pain level was decreased.  (Tr. 479.)  Dr. Walker noted back stiffness/pain, joint pain, limitation of joint movement, but no neck pain/stiffness or joint swelling.  (Tr. 480.)  He also noted neurologic weakness but no paresthesia; muscle weakness and decreased muscle tone in the lower left extremity; 4/5 strength; decreased calf circumference; and, abnormal light touch sensation.  (Tr. 480-81.)

In an undated Basic Medical form, Dr. Walker indicated that Jacobs suffers from "sciatica 724.3, degenerative disc disease 722.6, degenerative intervertebral disc-cervical 722.4 [and] spinal stenosis 724.00."  (Tr. 365.)  Dr. Walker indicated that Jacobs's medical issues were stable but still cause physical symptoms, and he did not anticipate much more improvement.  *Id*. He further opined that Jacobs could stand/walk five hours in an eight-hour workday (one hour

without interruption) and sit for eight hours (45 minutes without interruption).[3]  (Tr. 366.)  He

stated that Jacobs could lift six to ten pounds occasionally, but left blank all the boxes indicating

the weight that could be lifted frequently.[4]  *Id*.  Dr. Walker noted that Mr. Jacobs was extremely

limited in his ability to push/pull, bend, reach, and to perform repetitive foot movements.  (Tr.

366.)  Jacobs was noted to have markedly limited ability in handling, but no problems seeing,

hearing, or speaking.  *Id*.  Dr. Walker indicated that his opinion was supported by MRIs

performed on February 10, 2012 and April 7, 2011.  *Id*.  Finally, Dr. Walker indicated that the

aforementioned limitations were expected to last 12 months or more.  *Id*.

On June 12, 2012, State Agency physician William Bolz, M.D., opined that Jacobs could

lift up to ten pounds both occasionally and frequently (and push and pull within these

parameters); stand/walk a total of 2 hours and sit for six hours in an eight-hour workday;

occasionally climb ramps/stairs, balance, kneel, crouch, and crawl; never climb ladders, ropes, or

scaffolds; limited reaching and handling; unlimited fine manipulation; and, had no environmental

limitations except to avoid all exposure to  hazards and heights.  (Tr. 108-110.)

On July 12, 2012, Jacobs told Dr. Walker that he was doing better from a pain standpoint

and was not using his cane much.  (Tr. 475.)  On examination, Jacobs had neck tenderness and

abnormal range of motion, lumbar spine tenderness, and decreased muscle tone in the lower left

extremity.  (Tr. 476.)  He continued to recommend regular physical activity and flexibility

exercises.  (Tr. 477.)

On September 13, 2012, State Agency physician Elizabeth Das, M.D., agreed with Dr.

---

[3]  The form indicates that Jacobs was last seen by Dr. Walker on May 14, 2012.  (Tr. 366.)

[4]  "Up to 5 lbs." was the lowest amount that could be checked on the form.  (Tr. 366.)

8

Bolz's assessment in its entirety. (Tr. 130-132.)

On September 16, 2012, Jacobs presented to the Wadsworth-Rittman Hospital ER indicating that he fell down the steps after tripping over his shoe laces. (Tr. 391.) He hit his face during the fall and was uncertain if he lost consciousness. *Id*. He denied bruising, neck pain, or radicular symptoms, but did report pain in his lower back, right shoulder, and right first metacarpal. *Id*. Jacobs had 5/5 muscle strength in both the upper and lower extremities and his gait was within normal limits. *Id*. Jacobs was given Ibuprofen and Percocet for his pain. (Tr. 392.)

On September 25, 2012, Jacobs was seen by Dr. Walker and stated that he had fallen down the stairs when his left leg gave out. (Tr. 472.) He complained of lingering pain in his face and chest from the fall. *Id*. Dr. Walker noted chest pain, blurred vision, neck stiffness/pain, back stiffness/pain, limitation of joint movement, but no neurologic symptoms. (Tr. 473.) Dr. Walker also noted an abnormal gait. *Id*. The treatment plan included obtaining an x-ray of Jacobs's ribs to address fracture concerns. (Tr. 474.)

On October 15, 2012, Jacobs reported that he was doing better, but still experienced pain in his ribs. (Tr. 468.) His facial pain had improved and was taking an increased dose of Oxycodone, which he felt provided greater relief for his chronic pain. *Id*. Jacobs presented with neck stiffness/pain, joint pain, tenderness over the left ribs. (Tr. 469.) Dr. Walker assessed sciatica, closed fracture of one rib, and trauma to the face/neck. *Id*. The prescription for Oxycodone was increased. *Id*.

On October 16, 2012, Dr. Walker completed a Residual Functional Capacity Questionnaire. (Tr. 382-83.) Therein, Dr. Walker indicated that Jacobs suffers from chronic

pain, disc degeneration disease, and sciatica—all with a poor prognosis.  (Tr. 382.)  Dr. Walker identified Jacobs's symptoms as pain, weakness, parasthesius [sic], numbness, and poor ambulation.  *Id*.  Jacobs also experienced the following side effects from his medications: dizziness, drowsiness, upset stomach, itching, urinary hesitation, and mental status change.  *Id*. Dr. Walker indicated Jacobs could walk a one-half city block without rest or pain, and could stand/walk fifteen minutes at one time and only fifteen minutes in an entire 8-hour work day.  *Id*. He similarly indicated that Jacobs could sit for fifteen minutes at a time for a total of fifteen minutes in a workday.  *Id*.  Dr. Walker opined that a sit/stand option was necessary as well as unscheduled breaks that would occur constantly.  *Id*.  Dr. Walker further opined Jacobs could occasionally (up to 1/3 of an 8-hour workday) lift/carry ten pounds but never any more weight. (Tr. 383.)  Dr. Walker stated that Jacobs could perform gross manipulation for 60% of the workday, fine manipulation for 90%, and reach with his arms 25% of the time.  (Tr. 383.)  He also opined that Jacobs would be absent more than four times per month due to his impairments. *Id*.  Dr. Walker did not believe Jacobs was a malingerer and opined he could not work full-time on a sustained basis.  *Id*.

On October 28, 2012, Jacobs presented to the Wadsworth-Rittman Hospital ER again stating that he fell down the steps after being struck in the face by another person.  (Tr. 387.)  He complained of right knee and lower back pain.  *Id*.  Examination revealed some midline tenderness over his mid to lower lumbar spine.  (Tr. 388.)  Pain was exacerbated by moving, bending, and twisting.  *Id*.  Jacobs had 5/5 strength in his upper and lower extremities.  *Id*. Straight leg raising was negative.  *Id*.  Jacobs had a normal gait.  *Id*.  Hospital staff noted that Jacobs failed to report that he was taking both Vicodin and Percocet.  *Id*.  He was given Percocet

10

at the hospital but was not sent home with any narcotic medication.  *Id.*

On October 28, 2012, an x-ray of Jacob's lumbar spine showed "moderately severe degenerative disk disease at the lumbosacral junction," but no subluxation or signs of acute traumatic injury.  (Tr. 389.)

On January 9, 2013, Jacobs reported to Dr. Walker that his pain was better controlled, that he was applying for disability, and that he needed some assistance with activities of daily living.  (Tr. 497.)  Examination revealed neck tenderness, tenderness directly over left ribs, and decreased musculature of the left calf.  (Tr. 498.)  Dr. Walker advised Jacobs to quit smoking and lose weight, and also recommended regular physical activity and flexibility exercises.  (Tr. 499.)

On January 16, 2013, Dr. Walker completed another Residual Functional Capacity Questionnaire.  (Tr. 488-89.)  Therein, Dr. Walker indicated that Jacobs suffers from chronic pain syndrome and sciatica    both with a poor prognosis.  (Tr. 488.)  Dr. Walker identified Jacobs's symptoms as pain, numbness, weakness, parasthesias [sic], and poor ambulation.  *Id.* Dr. Walker stated that Jacobs's symptoms would constantly interfere with his ability to concentrate on simple work-related tasks.  *Id.*  Jacobs also experienced the following side effects from his medications: dizziness, drowsiness, pruritis, and urinary retention.  *Id.*  Dr. Walker indicated Jacobs could walk a one city block without rest or pain, and could stand/walk ten minutes at one time for a total of two hours in an 8-hour work day.  *Id.*  He similarly indicated that Jacobs could sit for ten minutes at a time for a total of two hours in a workday.  *Id.*  Dr. Walker opined that a sit/stand option was necessary as well as unscheduled breaks every twenty to thirty minutes and last for 15 to 20 minutes.  *Id.*  Dr. Walker further opined Jacobs could occasionally (up to 1/3 of an 8-hour workday) lift/carry ten pounds but never any more weight.

11

(Tr. 489.)  Dr. Walker checked the box indicating Jacobs had no limitations doing repetitive, reaching, handling, and fingering.  *Id*.  He did opine that Jacobs would be absent more than four times per month due to his impairments.  *Id*.  Dr. Walker did not believe Jacobs was a malingerer and opined he could not work full-time on a sustained basis.  *Id*.

On May 1, 2013, Jacobs reported to Dr. Walker that he had increased activity and improved function.  (Tr. 494.)  Dr. Walker's symptoms included back pain, joint pain, limitation of joint movement, numbness, and paresthesia.  (Tr. 495.)  Physical examination revealed neck tenderness and decreased musculature of the left calf.  *Id*.

On July 31, 2013, Jacobs reported that his exercise was limited by chronic pain and sciatica.  (Tr. 558.)  Back pain, joint pain, limitation of joint movement, and neurologic weakness were all noted.  (Tr. 559.)

On August 12, 2013, Dr. Walker completed a third Residual Functional Capacity Questionnaire.  (Tr. 509-511.)  Therein, Dr. Walker indicated that Jacobs suffers from sciatica with a poor prognosis.  (Tr. 509.)  Dr. Walker identified Jacobs's symptoms as pain, numbness, weakness, parasthesias, and decreased range of motion.  *Id*.  Dr. Walker stated that Jacobs's symptoms would constantly interfere with his ability to concentrate on simple work-related tasks. *Id*.  Jacobs also experienced the following side effects from his medications: itching, drowsiness, weight gain, nausea, and urinary retention.  *Id*.  Dr. Walker indicated that Jacobs would need to recline or lie down in excess of normally allotted breaks.  *Id*.  He indicated Jacobs could walk zero city blocks without rest or pain, and could stand/walk fifteen minutes at one time for a total of two hours in an 8-hour work day.  *Id*.  He similarly indicated that Jacobs could sit for twenty minutes at a time for a total of three hours in a workday.  *Id*.  Dr. Walker opined that a sit/stand

option was necessary as well as unscheduled breaks every thirty to forty-five minutes and last for at least ten to fifteen minutes.  *Id*.  Dr. Walker further opined Jacobs could occasionally (up to 1/3 of an 8-hour workday) lift/carry less than ten pounds but never any more weight.  (Tr. 510.) He stated that Jacobs could perform gross manipulation for 40% of the workday, fine manipulation for 40%, and reach with his arms 40% of the time.  *Id*.   He again opined that Jacobs would be absent more than four times per month due to his impairments.  *Id*.  Dr. Walker did not believe Jacobs was a malingerer and opined he could not work full-time on a sustained basis. *Id*.

On October 22, 2013, Jacobs was seen by Dr. Walker.  (Tr. 545-547.)  The visit was focused on Jacobs's treatment for pneumonia and endocarditis; his musculoskeletal symptoms were not discussed.  *Id*.

On February 20, 2014, Jacobs reported to Dr. Walker that he has difficulty ambulating in the winter; has some weakness in his legs; he requires some assistance with activities of daily living; and, has numbness in his hands and fingers.  (Tr. 572-575.)  Jacobs's symptoms included back pain, joint pain, limitation of joint movement, and paresthesia.  (Tr. 573.)  Musculoskeletal examination revealed neck tenderness, decreased muscle tone in the lower extremities, and decreased musculature in the left calf.  (Tr. 574.)

On April 25, 2014, Jacobs told Dr. Walker that his medication was effective but did not last long enough.  (Tr. 579.)  He reported sometimes using a cane.  *Id*.  Dr. Walker's observations included back pain, joint pain, limitation of joint movement, paresthesia, neck tenderness, decreased muscle time in the lower extremities, and decreased musculature in the left calf.  (Tr. 580.)  Dr. Walker increased Jacobs's prescription for OxyContin to one pill four times a day.

13

(Tr. 581.)  He indicated that Jacobs would be referred to pain management if Jacobs felt another increase in pain medication was needed.  *Id*.

**Relevant Hearing Testimony**

The ALJ posed the following hypothetical to the VE:

For purposes of the hypotheticals, please assume we're dealing with an individual the same age, education, work experience as the claimant.  Our hypothetical individual would be limited to sedentary as defined.  They could occasionally climb ramps, stairs, balance, stoop, kneel, crouch, crawl, never climb ladders, ropes, or scaffolds, frequent reaching and handling bilaterally   that's reaching in all directions, avoid concentrated exposure to temperature extremes, avoid all exposure to hazards such as unprotected heights, further limited to unskilled work consisting of routine, repetitive tasks in a static environment, no strict time or strict fast paced   I'm sorry, no strict time or strict high production quotas.  No past work.  Any work you can cite?

(Tr. 72.)

The VE responded that such an individual could perform the work of an order clerk, Dictionary of Occupational Titles ("DOT") § 209.567-014; document preparer, DOT § 249.587-018; polisher of eyeglass frames, DOT § 713.684-038.[5]  (Tr. 72-73.)  When asked the impact of two fifteen minute breaks (in addition to those normally allowed), the VE stated that such an individual would be off task and there would be no jobs available.  (Tr. 73.)

The ALJ posed a second hypothetical question adding to the first the restriction of frequent reaching, handling, and fingering.  (Tr. 73.)  The VE replied that the previously identified jobs would remain available.  *Id*.

Finally, the ALJ posed a third hypothetical question again adding to the first the restriction of occasional reaching, handling, and fingering.  (Tr. 73-74.)  The VE testified that

---

[5]  The VE stated that these jobs could be performed alternating between sitting and standing every thirty minutes.  (Tr. 73.)

14

there would be no jobs for such an individual.  (Tr. 74.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[6]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Jacobs was insured on his alleged disability onset date, October 15, 2011, and remained insured through the date of the ALJ's decision, July 16, 2014.  (Tr. 22.)  Therefore, in order to be entitled to POD and DIB, Jacobs must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v.*

---

[6]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

*Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Jacobs established medically determinable, severe impairments, due to cervical and lumbar degenerative disc disease, cervical stenosis, depressive disorder, and generalized anxiety disorder. (Tr. 22.) However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 23.) Jacobs was found incapable of performing his past relevant work, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of sedentary work. (Tr. 24, 29.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Jacobs was not disabled. (Tr. 29-30.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular

16

conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than

a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v.

Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in

the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762,

772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v.

Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270,

273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing

Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th

Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported

by substantial evidence, however, a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits

or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence

in the record to support the decision, [where] the reasons given by the trier of fact do not build an

17

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *Treating Physician*

Jacobs claims the ALJ erred by failing to provide good reasons for the weight ascribed to his treating physician, John Walker, M.D. (ECF No. 15-1 at 11-18.) Conversely, the Commissioner maintains that the ALJ properly assigned little weight to Dr. Walker's opinions. (ECF NO. 16 at 8-15.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating

18

physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating

source medical opinions are still entitled to deference and must be weighed using all of the

factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[7]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234 (6th Cir. Ohio 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  The

purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants

understand the disposition of their cases,' particularly where a claimant knows that his physician

has deemed him disabled and therefore 'might be bewildered when told by an administrative

bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id*.

(quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the

explanation "ensures that the ALJ applies the treating physician rule and permits meaningful

appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the

significance of this requirement, the Sixth Circuit has held that the failure to articulate "good

reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence,

even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d

---

[7]  Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating
physician's opinion, the Commissioner should consider the length of the relationship and
frequency of examination, the nature and extent of the treatment relationship, how
well-supported the opinion is by medical signs and laboratory findings, its consistency with the
record as a whole, the treating source's specialization, the source's familiarity with the Social
Security program and understanding of its evidentiary requirements, and the extent to which
the source is familiar with other information in the case record relevant to the decision.

at 243.  Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

F.3d at 406.

With respect to Dr. Walker's opinions, the ALJ discussed them as follows:

> Despite the typical findings on exam, the claimant's treating physician, Dr. John
> Walker, in March 2012 concluded that the claimant cannot work and, "should be
> granted temporary disability."  In fact, the claimant reported to Dr. Walker on
> March 21, that his pain level decreased on opiates.  Indeed, the following July, the
> claimant reported even greater improvement in his pain level (Exhibit 9F).  Thus
> controlling weight cannot be given to Dr. Walker's statements.  These are issues
> reserved to the Commissioner and the objective medical evidence does not
> support his conclusions.  Considering the relatively normal findings in the record
> I can give this opinion little weight.  The claimant may have some issues with his
> left leg, but not to the extent he could not perform any work-related activity, even
> for a short period.  Moreover, his activities of daily living exceed his subjective
> complaints and even the objective findings.  Moreover, in May 2013, the claimant
> reported increased activity and improvement with his function
> (Exhibit 11 F/4).
>
> In February 2014, the claimant reported to Dr. Walker that he had some weakness
> in his legs and required assistance with ADLs.  He also complained of numbness
> in his hands and fingers.  Dr. Walker reviewed an MRI that showed cervical disc
> protrusion with mild ventral mass effect as well as degenerative disc disease.
> However, his symptoms and strength increased due to less frequent pain
> symptoms.  On examination, the claimant had normal neck range of motion but
> some tenderness.  He had normal range of motion in the upper and lower
> extremities, though decreased muscle tone in the lower left extremity.  He was
> ordered to continue his current medication and remain compliant with his pain
> medication contract (Exhibit 19F).  The following April, the claimant complained
> that the medication did not last long enough, though it is effective.  Consequently,
> Dr. Walker increased his Oxycodone dose to one pill, four times per day and
> noted that a referral to pain management would be necessary for any further
> medication increases (Exhibit 20F).
>
> As far as the claimant's mental impairments are concerned, the record does not
> show any current or past treatment for anxiety and depression, though Dr. Walker
> notes the claimant has both.  He notes also that he treats the claimant with Paxil

and Ativan, which the record shows, but the claimant has little to no complaints regarding ongoing symptoms. The claimant takes Ambien for insomnia, as well (Exhibit 16F; 19F). Still, Dr. Walker notes that he never referred the claimant to a mental health practitioner and the claimant has no functional restrictions related to his mental impairments (Exhibit 3F). However, that was in April 2012; and Dr. Walker has not made any conclusions regarding the claimant's mental health since that time.

As for the opinion evidence, Dr. Walker submitted several statements regarding the claimant's ability to perform work-related activity. I have reviewed these statements but find that they are not entitled to controlling weight. The statements are inconsistent with one another as well as the clinical findings contained in the record. In May 2012, Dr. Walker submitted that the claimant could only perform a limited range of work at the sedentary level of exertion. He could stand/walk for 5 hours and sit for 8 hours. He could lift/carry up to 10 pounds occasionally. He is markedly limited in handling and extremely limited in pushing/pulling, bending, reaching, and repetitive foot movements (Exhibit 4F). The record does not support these limitations; therefore, I give this opinion little weight. Records from March of that year indicate that the claimant's pain level as decreased. (9F/ 15) The next visit notes that he continues to improve and is not using his cane as often. (9F/11)

Later, in October 2012, Dr. Walker noted that the claimant has pain, weakness, numbness, tingling, and poor ambulation. He noted that these things interfere with the claimant's attention and concentration and that he needs to lay down at times. He can walk 1h block, sit 15 minutes, stand/walk 15 minutes at a time, stand/walk a total of 15 minutes, shift positions at will and take extra breaks, occasionally lift 10 pounds, have limited fine manipulation, limited reaching, limited gross handling, and absences at more than 4 per month (Exhibit 6F). I can only give little weight to this opinion as it is confounding and simply not supported by the objective medical evidence.

Later, in January 2013, Dr. Walker concluded the claimant has pain that interferes with his concentration and attention. Also, he could only walk less than one block, sit 10 minutes, stand/walk 10 minutes at a time, stand/walk a total of 2 hours, shift at will, break for 15 to 20 minutes, occasionally lift 10 pounds, and be absent 4 or more times per month (Exhibit l0F). For the reasons stated above, again, I give little weight to Dr. Walker's opinion. The record shows the claimant's level of activity goes beyond what Dr. Walker determines and that he is helped with medication use, as he reported to Dr. Walker on numerous occasions.

Lastly, in August 2013, Dr. Walker made yet another confounding opinion regarding the claimant's ability to perform work-related activity. He concluded

21

that the claimant cannot walk an [sic] blocks, sit 20 minutes, stand/walk 15 minutes at a time, sit a total of 3 hours, stand/walk a total of 2 hours, take unscheduled breaks every 30 to 45 minutes for 10-15 minutes at a time, occasionally lift less than 10 pounds, and has limited use of hands for fine and gross manipulation as well as reaching, and be absent for 4 or more times per month (Exhibit 13F).  Again, for reasons listed below, I must give this opinion little weight.

Dr. Walker never recommended the claimant see a specialist, despite his obviously severe limitations-according to the doctor.  He never recommended surgery, nor is such treatment warranted.  What he has recommended is regular physical activity, aerobic activity and flexibility exercises (11F/6).  He has only treated the claimant with opiates and the claimant has not had any worsening in his condition since the alleged onset date.  In fact, he continues to report improvement with pain and overall functioning (9F/ 15, 11; 11F/4).  Exams do routinely show decreased muscle tone over the lower left extremity along with neck tenderness.  However, other findings are variable at best.  Many exams fail to document any lumbar tenderness or issues with range of motion and describe reflexes and sensation as intact (11F/5).  Finally, I would note that the opinions themselves are inconsistent with each other.  For example, January 2013 claimant reportedly can sit 10 minutes at a time but in August 2013 he can sit for 20.  May of 2012 he can stand/walk for a total of 5 hours but in October, he indicates he can only stand/walk a total of 15 minutes. No explanation is given for these changes.  Consequently, I can give Dr. Walkers' opinions little weight overall.

(Tr. 25-27.)

The bulk of the reasons given by the ALJ for rejecting the opinions of Dr. Walker are poorly explained.  The ALJ stated that Jacobs's activities of daily living exceeded both the subjective complaints and the objective findings (Tr. 26) and that his level of activity goes beyond Dr. Walker's assessed limitations.  (Tr. 27.)  These statements are entirely unexplained.  Earlier in the decision, the ALJ noted that Jacobs is independent in activities of daily living ("ADLs"), performs activities around the house, and spends time with his girlfriend.  (Tr. 23.)  The ALJ fails to cite any evidence of record corroborating these statements.  Jacobs did testify that he occasionally has problems dressing and his girlfriend sometimes helps him with his shirt

22

or tying his shoes.[8]  (Tr. 63.)  In January of 2013, he reported difficulties with ADLs to Dr.

Walker (Tr. 497), though back in November of 2011 he told Dr. Walker he could perform ADLs.

(Tr. 416.)    In any event, the ALJ has failed to explain how an ability to perform ADLs

contradicts the limitations assessed by Dr. Walker.  The ALJ also does not identify any activities

beyond ADLs that Jacobs performs which are inconsistent with Dr. Walker's opinions.

The ALJ also maintains that the record contains "relatively normal findings;" that "[t]he

record does not support [the] limitations" assessed by Dr. Walker; and, that Dr. Walker's opinion

is "not supported by the objective medical evidence" and is "confounding."  (Tr. 26-27.)  These

blanket conclusory statements, without more, do not support the decision.  The ALJ, however,

fails to explain or identify any inconsistencies between the limitations assessed by Dr. Walker

and the objective evidence.  Such a terse and conclusory explanation does not, in and of itself,

constitute a "good reason" for rejecting a treating physician's opinion. *See, e.g., Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 245-46 (6th Cir. 2007) (finding an ALJ failed to give "good

reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ

merely stated, without explanation, that the evidence of record did not support the severity of

said limitations); *accord Dunlap v. Comm'r of Soc. Sec.*, 509 Fed. Appx. 472, 2012 U.S. App.

LEXIS 26483 (6th Cir. Dec. 27, 2012); *Bartolome v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS

135918, 2011 WL 5920928 (W.D. Mich. Nov. 28, 2011) (noting that merely citing to "the

evidence" and referring to the appropriate regulation was insufficient to satisfy the "good

reasons" requirement); *Beukema v. Comm'r of Soc. Sec.*, 2015 U.S. Dist. LEXIS 85253 (W.D.

Mich. July 1, 2015) ("Simply stating that the physician's opinions 'are not well-supported by any

---

[8]  The decision expressly acknowledges this testimony, but apparently rejects it.  (Tr. 25.)

objective findings and are inconsistent with other credible evidence' is, without more, too 'ambiguous' to permit meaningful review of the ALJ's assessment.") (*quoting Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013)).

The ALJ does point to some examinations that were "normal" and the decision contains occasional references to increased activity or improvement. (Tr. 26-27.) However, as this Court's own recitation of the medical evidence reveals, Dr. Walker's treatment notes are replete with abnormal findings. It is unclear how an isolated "normal" finding, "variable" findings, or the ups and downs reported in Jacobs's pain levels undermine Dr. Walker's opinions. The ALJ does not cite any medical opinions or experts supporting the medical judgment that normal neck range of motion or normal range of motion in the extremities on one examination negates Dr. Walker's assessment as to Jacobs's overall level of functioning. The ALJ is *not* a medical expert and concomitantly cannot *interpret* medical evidence. Without any medical expertise, it is unclear how the ALJ came to the conclusion that the isolated findings he identifies in his decision contradict or undermine the functional limitations Dr. Walker ascribed to Jacobs. It is well-established that an ALJ may not substitute his personal interpretation of the evidence for those of medical professionals. *See, e.g., Meece v. Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.") (*citing McCain v. Dir., Office of Workers' Comp. Programs*, 58 Fed. App'x 184, 193 (6th Cir. 2003) (citation omitted); *Pietrunti v. Director, Office of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2d Cir. 1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb

24

to the temptation to play doctor.")); *accord Winning v. Comm'r of Soc. Sec.*, 661 F. Supp.2d 807, 823-24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to make medical judgments.'"); *Stallworth v. Astrue*, 2009 U.S. Dist. LEXIS 131119, 2009 WL 2271336 at *9 (S.D. Ohio, Feb. 10, 2009) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.") (*quoting Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)).

> [I]t appears that [the ALJ] has attempted to circumvent the treating source rule by giving greater weight to his own interpretation of the treatment notes.  The ALJ's failure to identify other opinion evidence contained in the treatment notes leaves the Court to determine whether the notes actually contain opinions that are inconsistent with the formal treating source opinions or whether the ALJ has simply formulated his own medical opinion as a layperson interpreting the treatment notes.  *See Martin v. Commissioner of Social Sec.*, No. 1:08 CV 00301, 2009 WL 3110203 at *11 (S.D.Ohio Sept.24, 2009), unreported ("An ALJ, as a layperson, may not substitute his own opinions for those of the expert doctors.") *citing Brown v. Apfel*, 174 F.3d 59 (2nd Cir.1999); *Miller v. Chater*, 99 F.3d 972 (10th Cir.1996).

> ***

> The undersigned recommends that the Court find an additional flaw in the ALJ's logic.  The ALJ considered treatment notes inherently more reliable because they are maintained in the course of treatment; however, his logic undermines his conclusion.  Treatment notes are maintained for the purpose of improving a patient's condition, and they . . . may often speak in terms of maladies, not functional capacities. *Cf. Griffeth*, 2007 WL 444808 at *4 ("The RFC describes 'the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from-though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities.'") *quoting Howard*, 276 F.3d at 240. Therefore, it is improper for the ALJ to assign greater weight to treatment notes, which are in most instances not written with the intention of outlining functional limitations.  When the ALJ considered the treatment notes to be inherently more reliable than treating source opinions, he simply chose to abandon the treating source rule, which requires him to look at the treating sources opinions and afford them controlling weight if they are "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2);

25

> 416.927(d)(2).  Here, the ALJ did not follow the regulations and implemented a
> rule of logic that would always displace the treating source's opinion and permit
> the ALJ to substitute his own lay judgment on a review of the treatment notes.

*Harmon v. Astrue*, 2011 U.S. Dist. LEXIS 21939, 2011 WL 834138 (N.D. Ohio Feb. 8, 2011)

report and recommendation adopted, 2011 U.S. Dist. LEXIS 21945, 2011 WL 825710 (N.D.

Ohio Mar. 4, 2011).  As such, the ALJ's own interpretation of Dr. Walker's treatment notes is an

insufficient basis for rejecting Dr. Walker's assessment as to Jacobs's functional limitations.

The ALJ also stated that Dr. Walker never recommended Jacobs see a specialist or

recommended surgery.  (Tr. 27.)  Such a statement itself is a medical judgment.  It assumes,

without any basis in medical fact, that such modes of treatment are proper for an individual with

the same symptomology as Jacobs.  In other words, it is indicative of a belief that a person with

the limitations assessed by Dr. Walker would have been referred to a specialist or a surgeon.

Because Dr. Walker did not do so, the ALJ appears to conclude that either Dr. Walker was not

exercising sound medical judgment, or conversely, that Dr. Walker's assessment must overstate

Jacobs's functional limitations.  It is problematic, however, that these medical judgments do not

appear to be based on the opinion of a medical expert, a State Agency physician, or any other

physician of record, but rather the ALJ's personal judgment.

In deciding to ascribe little weight to Dr. Walker's opinions, the ALJ also points out that

his various opinions are inconsistent with one another.  (Tr. 27.)  The ALJ indicates that Dr.

Walker provided no explanation for the changes in levels of functioning.  *Id*.  Nonetheless, it

bears noting that the forms provided did not request the physician to explain any changes in

functioning from previous opinions rendered or provide any space for him to do so.  With two

exceptions, discussed below, Dr. Walker's opinions are not glaringly inconsistent.  Moreover, the

ALJ's assumption   that Jacobs's functional limitations should remain static over a fifteen month period   again strays into the impermissible area of medical judgment.  There are, admittedly, two major outliers contained in Dr. Walker's opinions.  One is specifically identified by the ALJ   an ability to sit and stand/walk for only fifteen minutes in an eight-hour workday contained in the October 16, 2012 opinion.  (Tr. 382.)  The second, which the ALJ does not identify, is the opinion that Jacobs had no limit in his ability to reach, handle, and finger.[9]

While the ALJ certainly had good reasons for rejecting these aforementioned outlying opinions, the ALJ essentially rejected Dr. Walker's opinions *en masse*.  With respect to the reaching and handling limitations in particular, the ALJ ultimately found that  Jacobs could frequently reach in all directions and handle bilaterally   thereby rejecting Dr. Walker's one outlying opinion that Jacobs had zero limitations in this area.  (Tr. 24.)  There is, however, no explanation as to why Dr. Walker's more restrictive limitations from his other three opinions, at least with respect to reaching and gross manipulation, were rejected.  As evidenced by the VE's testimony, the issue of how much Jacobs could reach, handle, and finger were outcome determinative.  (Tr. 73-74.)  Even if the Court were to find that the ALJ gave good reasons for

---

[9]  Dr. Walker's three other opinions consistently opine that Jacobs's ability to reach and perform gross manipulation is less than frequent (*i.e.* 2/3 of the workday).

|  | 5/4/12<br>Tr. 366 | 10/16/12<br>Tr. 383 | 1/16/13<br>Tr. 489 | 8/12/13<br>Tr. 510 |
|---|---|---|---|---|
| **Reaching** | Extremely Limited | 25% of workday | No limitations | 40% of workday |
| **Gross Manipulation** | Markedly Limited (Handling) | 60% of workday | No limitations | 40% of workday |
| **Fine Manipulation** | | 90% of workday | No limitations | 40% of workday |

27

rejecting Dr. Walker's opinions as it related to Jacobs's ability to sit, stand, and walk, it remains unclear why the ALJ agreed with three of Dr. Walker's opinions that Jacobs required some limitations in this area, particularly in reaching and gross manipulation, but disagreed with the extent of those limitations.  The ALJ's failure to give good reasons for rejecting these more restrictive limitations requires a remand.

Finally, the Court notes that the ALJ spent considerable time discussing Jacobs's pattern of seeking medical care at ERs, where he would often obtain narcotic pain medication.  (Tr. 27-28.) It appears that Jacobs, at times, concealed the existence or the extent of his prescriptions for narcotic pain medication from ER medical personnel.  The ALJ, however, does not tie any of this behavior to the self reporting of his symptoms and limitations to Dr. Walker, nor does he explain how this impacts the viability of Dr. Walker's opinions.

**VII.  Decision**

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion.

IT IS SO ORDERED.


<u>/s/ Greg White</u>
U.S. Magistrate Judge


Date: February 10, 2016